AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
MAR - 3 2022
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

LODGED
CLERK U.S. DISTRICT COURT
3/3/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: VAM  DEPUTY

United States of America

v.

LUIS MAGANA, a.k.a. "Junior" and "Jr.",

Defendant(s)

Case No.  2:22-mj-00886-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 1, 2022, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute a Controlled Substance. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Silvana M. Restrepo
Complainant's signature

Silvana Restrepo, DEA Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. in person

Date: March 3, 2022

Judge's signature

City and state: Los Angeles, California

Hon. Karen L. Stevenson, U.S. Magistrate Judge
Printed name and title

AUSA: Dominique Caamano (x0492)

## AFFIDAVIT

I, Silvana Restrepo, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against LUIS MAGANA, also known as "Junior" and "Jr." ("MAGANA"), for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Drug Enforcement Administration, in Los Angeles, California, as described more fully in Attachment A:

    a. a silver iPhone with a clear case requiring a four-digit passcode to access the device ("SUBJECT DEVICE 1"); and

    b. a silver iPhone with a clear case and a six-digit passcode to access the device ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA").  I am currently assigned to the Los Angeles Field Division ("LAFD").  At the LAFD, I am assigned to the Financial Investigations Group ("FIG").  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

6.   I received and completed formal training that included a 16-week DEA training program in Quantico, Virginia.  I have participated in several controlled substance investigations as the primary case agent and in a supporting role.  I have participated in debriefs of confidential sources and witnesses who had personal knowledge regarding drug trafficking

organizations.  In addition, I have discussed with numerous law enforcement officers and confidential sources the methods and practices used by drug traffickers.  I have also participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, financial analysis, records research, physical surveillance.  Moreover, I have assisted in the execution of search and arrest warrants related to illegal activities involving controlled substances.

7. As a result of my participation in these and other activities, I have gained particular knowledge in the use and utility of undercover agents, confidential informants, physical surveillance, electronic surveillance, oral surveillance, consensual recordings, investigative interviews, pole-mounted cameras, and the execution of search and arrest warrants.  I have also gained expertise in the identification and collection of drug and non-drug evidence and the analysis and the interpretation of recorded conversations.  Additionally, I have spoken with other experienced law enforcement officers and cooperating individuals about the packaging and preparation of drugs, methods of operation, and security measures employed by drug traffickers.

8. Through my involvement in drug investigations, discussions with other law enforcement personnel, classroom and field training, discussions with confidential informants, and arrest interviews of defendants involved in the trafficking of controlled substances, I have become familiar with the methods used by drug traffickers to import, transport, safeguard, and

distribute drugs, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

### III. SUMMARY OF PROBABLE CAUSE

9. Since approximately 2020, FIG agents have been investigating Luis MAGANA, a methamphetamine trafficker. The investigation has involved the use of two DEA confidential sources (hereinafter, "CS-1" and "CS-2") to negotiate the purchase of methamphetamine.

10. During the week of February 28, 2022, CS-1, at the direction of LAFD FIG agents, coordinated a controlled purchase of two pounds of methamphetamine from MAGANA in Whittier, California. During the controlled purchase, MAGANA arrived at the meet location in Whittier, California with approximately 19 pounds of methamphetamine. At the time of his arrest, MAGANA was found in possession of the SUBJECT DEVICES.

### IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

   **A. Communications Between MAGANA And Confidential Sources Concerning Drug Trafficking**

12. Since approximately October 2020, a DEA Confidential Source ("CS-1")[1] has been in contact with MAGANA. CS-1 and MAGANA had previously known each other socially.

---

[1] CS-1 began working with DEA in 2020. In 2000, the CS was charged with Aggravated Assault with a Deadly Weapon as well as
*(footnote cont'd on next page)*

13. In October 2020, DEA Special Agents spoke with CS-1, who told them the following:

    a. On or around September 27, 2020, CS-1 spoke with MAGANA's brother, who was believed to live in Mexico.

    b. During CS-1's conversation with MAGANA's brother, CS-1 learned that MAGANA's brother had moved back to Mexico from the San Fernando Valley area because MAGANA's brother may have had a warrant for his arrest relating to conspiracy charges. MAGANA's brother told CS-1 that an unknown person was captured, and MAGANA's brother was involved with the conspiracy.

    c. MAGANA's brother told CS-1 that he would have MAGANA contact CS-1, for anything s/he may need. MAGANA's brother stated that MAGANA will be reaching out to CS-1 to set up a drug deal.

14. In January 2021, LAFD FIG agents conducted a debriefing of CS-1, who told investigators the following:

    a. In December 2020, MAGANA went to CS-1's home uninvited. MAGANA told CS-1 that he heard through MAGANA's brother that CS-1 was looking for him. MAGANA asked CS-1 if s/he was interested in working with him. MAGANA told CS-1 that he has a lot of "stuff," but he mainly handles methamphetamine.

---

second degree escape and failure to appear. In the process of the court hearings, the CS failed to appear and was not convicted until October 2008. The CS has previously provided information to the DEA. The CS has provided truthful information to investigators which has been independently corroborated. CS-1 has previously provided information to the DEA in other investigations that has been corroborated and proven to be reliable, and has not provided any information that was later determined to be false or otherwise unreliable. CS-1 receives funds and immigration benefits for his/her cooperation.

MAGANA stated the price of methamphetamine has changed from $3,500 to $1,800 over the span of a month. MAGANA told CS-1 that he can sell one pound of crystal methamphetamine to CS-1 for $1,500.

        b.    MAGANA advised CS-1 that he also deals cocaine and the price per kilogram of cocaine has an approximate range of $35,000 to $36,000. MAGANA stated he does not handle cocaine too often because it is expensive.

        c.    MAGANA asked CS-1 if s/he wanted to transport drugs to Iowa, Illinois or Colorado.

15. In January 2021, DEA agents conducted another debriefing of CS-1. CS-1 stated that s/he spoke with MAGANA, and relayed to DEA agents the following:

        a.    CS-1 told MAGANA s/he was currently having money problems and that s/he was ready to start working for MAGANA;

        b.    CS-1 told MAGANA that s/he would like to start working for MAGANA in the local area or long distance like MAGANA had asked CS-1 during a previous meeting;

        c.    MAGANA asked CS-1 if his/her friend[2] had said anything else. CS-1 told MAGANA that his/her friend was ready to start purchasing from MAGANA since the friend was previously purchasing large quantities from a different source of supply before he was murdered and that the friend needed a new supplier. CS-1 told MAGANA s/he was going to reach out to the friend to see what the friend needed and that s/he would let

---

[2] The friend to which CS-1 and MAGANA referred is an undercover agent that never met with MAGANA and with whom no deal materialized.

6

MAGANA know. MAGANA said that was good and that he would reach out to CS-1 and let CS-1 know in advance once he had something for CS-1.

16. In February 2022, in a recorded call to MAGANA, CS-1 informed MAGANA that he/she had an associate (another DEA CS, hereinafter "CS-2") who typically is involved with trafficking cocaine and fentanyl, but wanted to start trafficking methamphetamine.[3] CS-1 and MAGANA arranged for CS-2 to contact MAGANA and to begin negotiating the purchase of large quantities of methamphetamine. CS-1 informed MAGANA that CS-1's "guy" (CS-2) was going to the Los Angeles area that week and that CS-1 was going to give MAGANA's number to CS-1's "guy" (that is, CS-2). CS-1 informed MAGANA that CS-1 instructed his friend (CS-2) to send a message to MAGANA beforehand, so that the friend (CS-2) can let MAGANA know when the friend (CS-2) will be arriving. MAGANA ended the conversation by saying that it would not be a problem and that MAGANA would see how MAGANA can accommodate the friend (CS-2).

17. In February 2022, DEA Special Agents met with CS-2. Agents conducted a debriefing of CS-2 and also provided a cellular telephone to CS-2, which was used to arrange and negotiate a purchase of 60 pounds of methamphetamine from

---

[3] CS-2 was previously involved in drug trafficking and was charged. CS-2 is receiving immigration benefits and is being paid to assist law enforcement. CS-2 has provided truthful information to investigators which has been independently corroborated. CS-2 has previously provided information to the DEA in other investigations that has been corroborated and proven to be reliable, and has not provided any information that was later determined to be false or otherwise unreliable.

MAGANA. Under the direction of agents, CS-2 placed a recorded phone call to MAGANA. The call went unanswered. A short time later, CS-2 sent a text message to the same telephone indicating that CS-2 was an associate of CS-1. A short time after sending the text message to MAGANA, CS-2 placed another recorded phone call to MAGANA. MAGANA answered the phone call, which I have listened to,[4] and CS-2 and MAGANA discussed the purchase of 60 pounds of methamphetamine which was to occur on or about Friday, February 18, 2022.

18. During the phone call between CS-2 and MAGANA, CS-2 and MAGANA agreed that 60 pounds of methamphetamine would be delivered to CS-2, that MAGANA would exchange drugs for money, and that MAGANA and CS-2 would contact one another the day before the meeting (that is, on Thursday, February 17, 2022) to determine where to meet. Ultimately this transaction was canceled because, according to MAGANA, his suppliers did not feel comfortable with MAGANA bringing such a large quantity of drugs to CS-2.

19. On or about February 25, 2022, a recorded call between CS-1 and MAGANA took place. On the call, CS-1 communicated to MAGANA that CS-1 was going to travel with his/her associate (CS-2) on Wednesday. MAGANA told CS-1 that MAGANA was not going to be in the area and that MAGANA was leaving to go to Mexico on Thursday. MAGANA asked CS-1 if it was possible to meet a day before. CS-1 responded that CS-1 was going to check with

---

[4] Unless otherwise indicated, all calls are generally in Spanish language, and I have listened to them as I am a native-Spanish language speaker.

8

his/her associate (CS-2) if they could meet on Tuesday instead. MAGANA asked CS-1 what CS-1 was picking up. CS-1 responded to MAGANA that it would depend on the quality of "las dos" that MAGANA would bring. Based on my training and experience, on this call, MAGANA and CS-1 were discussing a deal for a sample of two pounds ("las dos," in Spanish, means "the two") of methamphetamine. MAGANA stated to CS-1 that MAGANA was willing to bring the two so that the associate of CS-1 could check the quality. MAGANA informed CS-1 to have CS-1 let MAGANA know as soon as possible so that MAGANA could get ready since CS-1 and his/her associate were picking up "varias." Based on my training and experience, I understand "varias"--in the context of the conversation--to mean that MAGANA and CS-1 were discussing several pounds of methamphetamine because "varias" in Spanish mean several. CS-1 informed MAGANA that CS-1's associate (CS-2) did not want to drive on Sunday, but CS-1 and his/her associate (CS-2) would meet with MAGANA on Tuesday.

20. On or about February 28, 2022, CS-1 communicated to MAGANA, in a recorded call, that the following day (that is, March 1, 2022) at approximately 12:00 p.m., CS-1 was going to be in the Los Angeles area. MAGANA informed CS-1 that MAGANA was going to be waiting for CS-1. CS-1 informed MAGANA that CS-1 would be in the Downey area. MAGANA inquired with CS-1 whether CS-1 was going to go to MAGANA. CS-1 communicated to MAGANA that due to transportation, it was going to be easier for MAGANA to meet where CS-1 was located.

9

### B.  On March 1, 2022, MAGANA Delivers Approximately Two Pounds of Methamphetamine to CS-1, Along with An Additional Seventeen Pounds of Methamphetamine

21.  On or about March 1, 2022, MAGANA, in a recorded call, asked about what time CS-1 and MAGANA were going to meet.  CS-1 informed MAGANA that they were going to meet around 1:00 p.m.  MAGANA inquired with CS-1 on the location of the meeting.  CS-1 informed MAGANA that CS-1 was going to send MAGANA the location.  CS-1 stated to MAGANA that CS-1 was approximately 45 minutes away from Whittier.  MAGANA replied and indicated that MAGANA was approximately one hour away from Whittier.  CS-1 informed MAGANA that CS-1 was in the parking lot of Del Taco, which is located at 12320 Washington Blvd, Whittier, CA, 90606.  MAGANA replied to CS-1 that MAGANA was approximately 13 minutes away.

22.  On March 1, 2022, DEA agents established surveillance in the parking lot of the Home Depot located at 12322 Washington Blvd, Whittier, CA in the vicinity of the Del Taco restaurant.  At approximately 2:16 p.m., SA Adam Cirillo observed that a grey Honda sedan enter into the parking lot of the Home Depot.  SA Cirillo observed the Honda drive through the parking lot and park directly in front of where CS-1 was standing.  MAGANA, the sole occupant of the Honda, exited and began conversing with CS-1 at the back of the Honda.  CS-1 handed MAGANA $2,000, which was previously given to CS-1 by DEA agents for the purchase of approximately two pounds of methamphetamine.  While at the trunk of the Honda, MAGANA removed a black plastic bag and informed CS-1 that MAGANA brought 17 additional pounds in addition to the two pounds that MAGANA had agreed to sell CS-1.  MAGANA placed

10

the black bag from the trunk into the rear passenger seat of the Honda. MAGANA informed CS-1 to pick two pounds.

### C. MAGANA's Arrest

23. Moments after MAGANA informed CS-1 to pick two pounds, agents arrested MAGANA.

24. DEA agents then conducted a search of MAGANA's person and the Honda. Agents located approximately 19 pounds of methamphetamine: approximately 17 pounds were located in a red duffle bag located in the backseat of the Honda, and approximately 2 pounds of methamphetamine were located in a black trash bag, which was the same bag that agents previously observed MAGANA place into the rear passenger seats of the Honda. The SUBJECT DEVICES were also located during the search, with one device located on MAGANA's person in his front left pocket and the other device located plugged into a charging cable around the center console of the Honda. The SUBJECT DEVICES are identical-looking silver iPhones with identical-looking clear cases. One iPhone has a 4-digit pin code to unlock the device (SUBJECT DEVICE 1), while the other iPhone has a 6-digit pin code to unlock the device (SUBJECT DEVICE 2).

25. MAGANA was later transported to the DEA LAFD offices for processing.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

26. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

11

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27. As used herein, the term "digital device" includes the SUBJECT DEVICES.

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MAGANA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MAGANA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

31. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

32. For all of the reasons described above, there is probable cause to believe that MAGANA has committed a violation

16

of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 ~~by~~ *in person* ~~telephone~~ on this 3 day of March, 2022.

_____
THE HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

17